**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **ARNCO TECHNOLOGY TRUST LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **V.** | § | **Civil Action No.:  4:10-cv-01962** |
| | § | |
| | § | |
| **POSTLE INDUSTRIES, INC.,** | § | |
| **Defendant.** | § | |

## ARNCO TECHNOLOGY TRUST LTD.'S MOTION FOR CONTEMPT AND FOR SANCTIONS

TO THE HONORABLE LEE H. ROSENTHAL:

Plaintiff Arnco Technology Trust Ltd. ("Arnco") files this Motion for Contempt ("Motion") for violation of this Court's Agreed Final Judgment and Permanent Injunction (the "Permanent Injunction") [Dkt. No. 22] issued in this matter, and respectfully shows the Court as follows:

### I.    SUMMARY

1.    Arnco seeks a civil contempt order and sanctions against Postle Industries, Inc. ("Postle") and its President, John Postle, for violating this Court's order permanently enjoining them from disseminating or publishing any communication mentioning Arnco or its products.

2.    Arnco also seeks a civil contempt order and sanctions against Postle's distributor, WeldCor Supplies, Inc. ("WeldCor"), and WeldCor's President, Leroy Billesberger, for violating this Court's order permanently enjoining them from disseminating or publishing any communication mentioning Arnco or its products.  Alternatively, Arnco seeks discovery from Postle, WeldCor and Billesberger to determine whether WeldCor and/or Billesberger had notice of the Court's order.

## II.    FACTS AND PROCEDURAL HISTORY

### A.    The Parties

3.    Arnco is engaged in the business of developing and marketing wear-resistant hardbanding products for the drilling industry in Texas and numerous other states, and in other countries, including Canada.  *See* **Exhibit 1**, Affidavit of Frank McLaughlin, at ¶2.  Arnco has been the leader in hardbanding technology since 1992.  **Exhibit 1**, at ¶3.  Because the U.S. and Canada oil and gas markets have extensive potential for growth, Arnco has spent significant time and effort over the last several years to grow its business in these markets.  **Exhibit 1**, at ¶3. Arnco works primarily through its relationships with both end users of the product and applicators, who apply Arnco's products onto tubular goods and equipment used in the drilling industry.  **Exhibit 1**, at ¶4.  The role of the applicators is critical to Arnco because such entities are Arnco's primary outlets for sales of its products to the drilling industry. *Id.*  **Exhibit 1**, at ¶4.

4.    Defendant Postle Industries, Inc. ("Postle") also develops and markets hardbanding products for use in the drilling industry in Texas and numerous other states and countries, including Canada.  **Exhibit 1**, at ¶5.  Postle is a direct competitor of Arnco.  **Exhibit 1**, at ¶5.

5.    John Postle is and was the President of Postle at all relevant times.  **Exhibit 1**, at ¶6.  As discussed below, John Postle disseminated disparaging statements about Arnco and its products in 2010 that prompted the 2010 Lawsuit.

6.    WeldCor distributes Postle's products and is listed on Postle's website as Postle's "Global Technical Center" in Canada:   www.hardbandingsolutions.com/postle/contacts.php. **Exhibit 1**, at ¶7.

7.    On information and belief, Leroy Billesberger is and was the President of WeldCor at all relevant times.  **Exhibit 1**, at ¶7.  As discussed below, Mr. Billesberger forwarded

John Postle's disparaging statements to numerous people in 2010/2011.  Mr. Billesberger also posted his own disparaging comments about Arnco and its products on social media in 2018.

**B.**     **Postle's 2010 Disparaging Statements About Arnco and Its Products**

8.     Following is a summary of the facts related to the underlying 2010 Lawsuit.  A more complete version is set forth in Plaintiff's First Amended Petition, Verified Petition for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction (the "2010 Lawsuit") [Dkt. No. 1-1].

9.     On March 3, 2010, John Postle sent an email to an Arnco customer, Scott Day, an applicator employed by Weatherford.  **Exhibit 2**, Affidavit of Jason Arnoldy, at ¶3.  The email contained photographs and statements implying that Arnco's 300XT product was defective and inferior to Postle's product.  **Exhibit 2**, at ¶3.  **Exhibit 3** is a true and correct copy of John Postle's March 3, 2010 email.  **Exhibit 2**, at ¶3.

10.     On March 18, 2010, John Postle sent a letter addressed to Postle's Technical Centers in which he denigrated Arnco and several Arnco products.  **Exhibit 2**, at ¶4.  **Exhibit 4** is a true and correct copy of John Postle's March 18, 2010 Postle Letter (the "2010 Postle Letter").  The 2010 Postle Letter contained several false allegations that Arnco was engaged in "misleading the industry", that its products were not durable, that Arnco "throws a product together in a hurry because they are losing market share" and other disparaging statements.  **Exhibit 2**, at ¶4.

11.     Mr. Billesberger (WeldCor's President) received the 2010 Postle Letter and forwarded it to numerous people in the oil and gas industry.  **Exhibit 2**, at ¶5.

12.     Arnco learned of the 2010 Postle Letter on March 23, 2010, when Arnco began receiving communications from applicators, end users, and even a competitor advising that they and others had received the 2010 Postle Letter.  **Exhibit 2**, at ¶6.

C.      **The 2010 Lawsuit**

13.     Arnco sent a Cease and Desist letter to Postle and ultimately filed suit in Harris County District Court against Postle for publishing and disseminating false and defamatory statements about Arnco and its products.  **Exhibit 2**, at ¶7; [Dkt. No. 1-1].  Arnco asserted claims for business disparagement, tortious interference with business relations, false advertising, and unjust enrichment.  **Exhibit 2**, at ¶7.  In addition to damages, Arnco sought a permanent injunction preventing Postle from making any future statements about Arnco or its products.  **Exhibit 2**, at ¶7.  Postle removed the 2010 Lawsuit to the U.S. District Court for the Southern District of Texas, Houston Division, on June 3, 2010.  [Dkt. No. 1]

14.     Postle agreed to issue a Retraction Letter, which the Parties jointly drafted.  **Exhibit 2**, at ¶8.  A true and correct copy of the Retraction Letter is attached as **Exhibit 6** (the "Retraction Letter").  **Exhibit 2**, at ¶8.  The Parties later settled the 2010 Lawsuit at mediation and signed a Settlement Agreement.  **Exhibit 2**, at ¶8.  Postle's President, John Postle, was intimately involved in the 2010 Lawsuit and the settlement discussions.  **Exhibit 2**, at ¶9.  He attended the mediation and agreed to the settlement terms, which, among other things, required that Postle do the following:

(a)     pay Arnco $145,000;

(b)     provide statements identifying all known recipients of the disparaging statements; and

(c)     agree to be permanently enjoined from disseminating any communications against Arnco or its products without Arnco's written approval and to facilitate incorporation of the permanent injunction into the final judgment entered by the Court.

**Exhibit 2**, at ¶9.  A true and correct copy of the Settlement Agreement signed at the mediation is attached as **Exhibit 5**.  **Exhibit 2**, at ¶9.

15.     John Postle's Retraction Letter was an important part of the consideration Arnco received in exchange for settling its claims and dismissing the lawsuit.  **Exhibit 2**, at ¶10.  In the

Retraction Letter, John Postle specifically addressed each one of his disparaging (and false) statements and expressly admitted that each was "not true," "inaccurate" or "misleading." **Exhibit 2**, at ¶10.  John Postle also expressed "regret" for his statements and admitted that "my comments casting aspersions on the corporate character of Arnco were completely out of line, untrue and embarrassing for me and my company."  **Exhibit 2**, at ¶10; **Exhibit 6**.

16.     Arnco wanted to make sure that the Retraction Letter was sent to everyone who received the 2010 Postle Letter.  **Exhibit 2**, at ¶11.  Therefore, as part of the settlement, Postle was required to provide Arnco with statements from Postle employees and agents/distributors identifying individuals to whom they had forwarded the 2010 Postle Letter.  **Exhibit 2**, at ¶11; **Exhibit 5**, at ¶3.  WeldCor's President, Leroy Billesberger, provided such a letter identifying 40 individuals in the oil and gas industry to whom he had forwarded the 2010 Postle Letter; 35 of the recipients are Arnco customers.  **Exhibit 2**, at ¶11.  **Exhibit 7** is a true and correct copy of Mr. Billesberger's letter identifying the persons to whom he forwarded the 2010 Postle Letter. **Exhibit 2**, at ¶11.

17.     Postle also provided Arnco with a copy of John Postle's email addressed to "All recipients of my assessment dated March 18, 2010" forwarding the Retraction Letter.  **Exhibit 2**, at ¶12.  A true and correct copy of John Postle's email is attached as **Exhibit 8**.  **Exhibit 2**, at ¶12.

18.     Postle's, John Postle's and Billesberger's dissemination of defamatory statements caused Arnco's customers and potential customers to be concerned about using Arnco's products.  **Exhibit 2**, at ¶13.  Arnco spent a substantial amount of time and resources talking with customers and potential customers to address their concerns and show that the statements were false.  **Exhibit 2**, at ¶13.  The Retraction Letter—and having it sent to all recipients of John

Postle's defamatory statements—were essential to Arnco's efforts to diminish the damage to its business and reputation.  **Exhibit 2**, at ¶13.

19.     The most critical part of the consideration Postle agreed to in the settlement is the Permanent Injunction, which was intended to ensure that Arnco would never again have to spend its time and resources debunking false and defamatory statements made by Postle, John Postle, Postle's distributors, including WeldCor, or anyone else working with Postle.  **Exhibit 2**, at ¶14.  Arnco would not have settled the lawsuit without a Court order preventing Postle from ever mentioning Arnco or its products again.  **Exhibit 2**, at ¶14.

20.     At the Parties' request, the Court entered an Agreed Final Judgment and Permanent Injunction prohibiting Postle, its officers, directors, agents, *and all persons acting in concert with them*, from mentioning Arnco or its products in any communication without Arnco's written permission:

> ORDERED that *Postle, its officers, directors, agents, and all persons acting in concert with them* are permanently restrained and enjoined from initiating or causing to be initiated the dissemination or publication of correspondence, brochures, leaflets, advertisements or any other form of communication, whether in conventional or electronic form, which mentions Arnco Technology Trust Ltd. or any Arnco Technology Trust ltd. product, without prior written approval from Arnco Technology Trust Ltd.  However, Postle may, in oral or written response to an inquiry about Arnco products, respond factually and in good faith to the inquiry about Arnco products or qualities.

*See* Agreed Final Judgment and Permanent Injunction [Dkt. No. 22] (emphasis added).[1]  Thus, absent Arnco's written approval, the *only* time any enjoined party can mention Arnco or its products is in response "to an inquiry about Arnco products."  *Id*.

---

[1] On January 4, 2011, the Court entered an Order of Dismissal.  [Dkt. No. 20]  However, the Court did not have the benefit of the agreed permanent injunction, which the Parties intended to be included in the final judgment.  At the Parties' request, the Court reinstated the case for the limited purpose of entering the Agreed Final Judgment and Permanent Injunction.  [Dkt. No. 21]

**D.**   <u>**Violations of the Permanent Injunction**</u>

21.   Arnco recently learned that Postle and John Postle blatantly violated this Court's Permanent Injunction on at least two occasions by mentioning Arnco and/or its products in written communications.  *See* <u>**Exhibit 1**</u>, at ¶8.

22.   Arnco also discovered several LinkedIn postings by Leroy Billesberger disparaging Arnco and its products.  <u>**Exhibit 1**</u>, at ¶9.  Given that, as part of Postle's settlement with Arnco, Mr. Billesberger had to write a letter identifying the individuals to whom he forwarded the 2010 Postle Letter that was the subject of the 2010 Lawsuit, Arnco believes that Mr. Billesberger had notice of both the 2010 Lawsuit and the Permanent Injunction.  <u>**Exhibit 1**</u>, at ¶9.

23.   Each of the statements made by Postle, John Postle, and Mr. Billesberger violates the Permanent Injunction.  None responds to an inquiry about Arnco products.  <u>**Exhibit 1**</u>, at ¶10.  On the contrary, each was initiated by the author.  <u>**Exhibit 1**</u>, at ¶10.  And when viewed together, the statements reveal a coordinated effort by Postle, John Postle, and Mr. Billesberger/WeldCor to attack Arnco and its products.

24.   First, Postle issued a May 2018 Bulletin questioning Arnco's 150XT and 350XT products (the "2018 Postle Bulletin").  <u>**Exhibit 9**</u> is a true and correct copy of the 2018 Postle Bulletin.  <u>**Exhibit 1**</u>, at ¶11.  The 2018 Postle Bulletin starts by extolling the virtues of Fearnley Proctor International Ltd.'s NS-1 certification for hardbanding products and noting that the certification was recently modified to emphasize two rules; i.e., that the product (wire) should be reliable and applicator friendly; and the product should be easily reapplied over itself and there should be a high level of success for reapplication over other stable hardbanding products.  <u>**Exhibit 1**</u>, at ¶11; <u>**Exhibit 9**</u>.  The 2018 Postle Bulletin states that "[s]ome hardbanding wire manufacturers/distributors will have a hard time complying with revision to the NS-1 approval.

Why would a hardbanding wire manufacturer/distributor allow their approvals to expire?" **Exhibit 1**, at ¶11; **Exhibit 9**.  It then shows an excerpt purportedly from Fearnley Proctor's website noting that approvals for two of Arnco's products have "expired".  **Exhibit 1**, at ¶11; **Exhibit 9**.  The 2018 Postle Bulletin then poses more questions about Arnco and its products: "To add even more confusion to the story, why would a hardbanding wire manufacturer/distributor introduce a piece of equipment that performs hardbanding removal efficiently and economically?  Is it because they need to address an inherent problem with their product?"  **Exhibit 1**, at ¶11; **Exhibit 9**.  It concludes with:  "Don't get H.O.G.-tied" and promotes Hardbranding Solutions by Postle.  **Exhibit 1**, at ¶11; **Exhibit 9**.  The H.O.G. is a grinding tool developed by Arnco in response to its customers' requirements to be able to safely and efficiently remove hardband that was applied incorrectly so that new hardband material can be reapplied.  **Exhibit 1**, at ¶11.  Thus, the 2018 Postle Bulletin implies that Arnco's product is defective and would not pass certification.  **Exhibit 1**, at ¶11.

25.     Second, as he did in 2010, Mr. Billesberger took Postle's statements to a broader audience.  He posted an article on LinkedIn stating that Arnco let its NS-1 certification expire, and "I am hoping that someone from Arnco will see this article and respond as I am somewhat confused and seek clarification."  **Exhibit 10** is a true and correct copy of Mr. Billesberger's LinkedIn posts (the "Billesberger LinkedIn Article").  **Exhibit 20**, Affidavit of Kathrine Silver, at ¶3.  Mr. Billesberger continued his assault by later posting that "it has now been 15 days since I posted this question and although We [sic] have had almost *4,000 views*, there is still no answer forthcoming. . . ."  *See* **Exhibit 10** (emphasis added).  **Exhibit 1**, at ¶12.

26.     Third, Mr. Billesberger also posted a response to a May 2018 LinkedIn discussion in which a supervisor at Weatherford commented favorably about re-applying Arnco's product 350XT.  **Exhibit 1**, at ¶13.  Mr. Billesberger responded that "if you have to use 350XT, the

plasma gouge and then reapply is an excellent way to go.  Smarter yet is to use [a different product] . . . ."  **Exhibit 1**, at ¶13.  *See* **Exhibit 11** (the "Billesberger LinkedIn Comments"); *see also* www.linkedin.com/feed/update/urn:li:activity:6405374968435216384/.  **Exhibit 20**, at ¶4.

27.     Fourth, while Arnco was investigating the extent of the damage caused by the 2018 Postle Bulletin, one of Arnco's customers sent Arnco an article published by Postle on December 15, 2014, disparaging several Arnco products.  **Exhibit 1**, at ¶14.  **Exhibit 12** is a true and correct copy of the December 15, 2014 article (the "2014 Postle Article").  **Exhibit 1**, at ¶14. The 2014 Postle Article is five pages long, contains false information, misleads end users about the effects of boron, and specifically discusses Arnco and its products throughout.  **Exhibit 1**, at ¶14.  In the opening paragraph, the article states: "Arnco 150XT, 300XT, and Arnco$^{TM}$ 350XT are generally referred to as a Boron Carbide (Boride) Base Alloys."  **Exhibit 1**, at ¶14; **Exhibit 12**.  It goes on to state "Boron, whose chemical Symbol is 'B', has been used in a number of hardbanding alloys for wear resistance, but because of cracks and spalled weld metal, and unpredictability perhaps the 'B' should stand for 'Beware'."  **Exhibit 1**, at ¶14; **Exhibit 12**.  On page 3, paragraph 2, the memo states: "While these two third party observations appear to be contradictory, they underline the unpredictable nature of cracking with Boron Base alloys such as Arnco 150XT and Arnco 350XT.  This is problematic since there is no assurance that these re-applications are safe or reliable." **Exhibit 1**, at ¶14; **Exhibit 12**.  (**Exhibits 9, 10, 11, and 12** are collectively referred to as the "Disparaging Communications").  All of these statements paint a picture that Arnco's 150XT and 350XT wires are unstable and of a cracking nature.  **Exhibit 1**, at ¶14.  These statements are patently untrue.  **Exhibit 1**, at ¶14.  Arnco has had extensive testing performed by third party companies to ensure the wires are stable and do not crack.  **Exhibit 1**, at ¶14.

28.     On May 30, 2018, Arnco's counsel sent a Cease and Desist letter to Postle attaching the Permanent Injunction and Disparaging Communications, and demanding, among other things, that Postle stop violating the Court's Permanent Injunction.  **Exhibit 13**  is a true and correct copy of the May 30, 2018 Cease and Desist letter.  **Exhibit 20**, at ¶5.

29.     On June 5, 2018, Postle Industries, Inc.'s Associate General Counsel replied stating that he represents "Postle Industries, Inc., a Delaware corporation ("Postle Delaware")", that "Postle Delaware" (1) was formed after the Permanent Injunction was signed; (2) is "not a party to the Order",  and (3) purchased the assets of Postle Ohio in 2014 but "did not purchase or succeed to the liabilities or obligations of Postle Ohio, including the Order.  As such we do not believe the Order binds Postle Delaware."  **Exhibit 14** is a true and correct copy of Postle's June 5, 2018 response.  **Exhibit 20**, at ¶6.  Nonetheless, Postle advised that it notified its sales staff and marketing departments to stop distributing the materials attached to Arnco's Cease and Desist Letter and not to create or distribute future materials mentioning Arnco.  **Exhibit 14**.  The letter also stated that Postle had asked WeldCor "to remove the LinkedIn post concerning your client and not to distribute any marketing material comparing Postle Delaware products to your client's products" but also claimed that WeldCor is an independent third party over whom Postle has no control.  **Exhibit 14**.

30.     Shortly after Postle sent this letter, Postle put out a second Bulletin (also dated May 2018) that is virtually identical to the original 2018 Postle Bulletin except that it does not specifically mention Arnco or its products.  **Exhibit 15** is a true and correct copy of the second Bulletin.  **Exhibit 1**, at ¶25.  Nonetheless, the Bulletin clearly follows up on and breathes new life into Postle's previous statements that Arnco's NS-1 certifications expired, presumably because the products are defective and would not pass the new certification requirements.  Arnco received the second Bulletin from one of its Canadian customers.  **Exhibit 1**, at ¶25.

31.     WeldCor/Mr. Billesberger also continued to take shots at Arnco regarding the NS-1 certification expiration.  Mr. Billesberger even wrote on LinkedIn that he was asked to take down his post about Arnco, but said he would not delete it until the following week *to give people more time to comment, and that he would be posting other thoughts on this topic in the near future*:



**Exhibit 16**, is a true and correct copy of Mr. Billesberger's post.  **Exhibit 20**, at ¶7.

32.     One thing is abundantly clear:  Postle, John Postle, and Mr. Billesberger/WeldCor have no intention of complying with this Court's Permanent Injunction or stopping their coordinated assault on Arnco.  Postle, et al. obviously believe that the damage they are doing to Arnco's—their competitor's—business is more valuable than any sanction this Court could impose.  And there is no doubt that the Disparaging Communications, Postle's second Bulletin, and Billesberger's subsequent LinkedIn postings are harming Arnco's business and causing it to

spend thousands of dollars to defend itself against statements that Postle, et al. were ordered not to make.

33.     Accordingly, Arnco seeks a civil contempt order and sanctions against Postle and John Postle.  Arnco also seeks a civil contempt order and sanctions against WeldCor and Mr. Billesberger.  Alternatively, Arnco seeks discovery from Postle and Mr. Billesberger/WeldCor to determine whether Mr. Billesberger and/or WeldCor had notice of the Permanent Injunction.

### III.     ARGUMENT AND AUTHORITIES

#### A.     Legal Standard for Civil Contempt

34.     "Civil contempt can serve two purposes, either coercing compliance with an order or compensate[ing] a party who has suffered unnecessary injuries or costs because of contemptuous conduct."  *In re Bradley,*  588 F.3d 254, 263 (5th Cir. 2009) (citations omitted) (alteration in original).  "A movant in a civil contempt proceeding bears the burden to establish, by clear and convincing evidence, each of the following elements: (i) that an order was in effect; (ii) that such order 'required certain conduct by the respondent'; and (iii) that the respondent failed to comply with the order." *Young Again Products, Inc. v. Acord*, MISC. H-09-0282, 2014 WL 1600613, at *4 (S.D. Tex. Apr. 21, 2014) (Rosenthal, J., adopting magistrate recommendation) (citing *Whitcraft v. Brown,* 570 F.3d 268, 271–72 (5th Cir. 2009)).  Evidence of contempt must be " 'so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts' of the case." *Id.* "The contemptuous actions need not be willful," however, "so long as the contemnor actually failed to comply with the court's order." *Id.*

35.     Federal Rule of Civil Procedure 65(d) states that "*every* injunction" order binds "only the following who receive actual notice of it by personal service *or otherwise*:

(A)     the parties;

(B)     the parties' officers, agents, servants, employees, and attorneys; and

(C)     other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Fed. R. Civ. P. 65.  In addition, "any party who knowingly aids, abets, or conspires with another to evade an injunction or order of a court is also in contempt of that court." *Whitcraft v. Brown*, 570 F.3d 268, 272 (5th Cir. 2009) (citing *NLRB v. Laborers' Int'l Union of N. Am., AFL–CIO,* 882 F.2d 949, 954 (5th Cir.1989). "Nonparties may also be held in civil contempt, but they must act with actual notice of the court's order and knowingly aid and abet another in violating the order." *Sec. & Exch. Comm'n v. Faulkner*, 3:16-CV-1735-D, 2018 WL 888910, at *3 (N.D. Tex. Feb. 13, 2018) (Fitzwater, J.).

## B.      Postle, John Postle, and Billesberger/WeldCor's Actions Warrant a Civil Contempt Order

36.     Here, there is clear and convincing evidence that a civil contempt order is proper. First, the underlying order is a *Permanent* Injunction.  As such, it has been in effect since the day it was entered and remains in effect forever.  Arnco and Postle—with input and approval from Postle's President, John Postle—agreed to the Permanent Injunction as part of their settlement. They drafted the Permanent Injunction and jointly asked the Court to sign it.

37.     Second, the Permanent Injunction clearly and specifically "required certain conduct" by Postle, John Postle, and anyone acting in concert with them, including WeldCor and its President, Mr. Billesberger.  In fact, the Permanent Injunction expressly states the actions Postle, John Postle, and others, are prohibited from taking and those they are allowed to take; i.e., the restrained parties/persons cannot mention Arnco or its products in any communication without Arnco's written approval *unless* it is a good faith, factual response to an inquiry about Arnco's products:

> Postle, its officers, directors, agents, and all persons acting in concert with them are permanently restrained and enjoined from

initiating or causing to be initiated the dissemination or publication of correspondence, brochures, leaflets, advertisements or any other form of communication, whether in conventional or electronic form, which mentions Arnco Technology Trust Ltd. or any Arnco Technology Trust ltd. product, without prior written approval from Arnco Technology Trust Ltd. However, Postle may, in oral or written response to an inquiry about Arnco products, respond factually and in good faith to the inquiry about Arnco products or qualities.

*See* Permanent Injunction [Dkt. No. 22].

38.     Postle and John Postle had "actual notice" of the Permanent Injunction and expressly agreed to it as part of the 2010 Lawsuit settlement.  **Exhibit  5**.

39.     Although WeldCor and Mr. Billesberger were not parties to the 2010 Lawsuit, Mr. Billesberger's dissemination of John Postle's disparaging statements was part of the dispute and the settlement.  Given that Postle required Mr. Billesberger to write a letter identifying every person to whom he forwarded the 2010 Postle Letter, Arnco believes that Mr. Billesberger and his company, WeldCor, had actual notice of both the 2010 Lawsuit and the Permanent Injunction.  **Exhibit 1**, at ¶9.

40.     Third, the Disparaging Communications alone unequivocally establish that Postle, John Postle, Mr. Billesberger and WeldCor failed to comply with the Permanent Injunction.  All mention Arnco and/or its products, all were issued without Arnco's written approval, and none responded to an inquiry about Arnco's products.  **Exhibits 9, 10, 11, and 12**.  For the same reasons, Mr. Billesberger's subsequent LinkedIn posts also violate the Permanent Injunction. **Exhibit 16**.

41.     John Postle admitted that he knew about the May 2018 Bulletin and that it should not have been sent.  After Arnco learned of the May 2018 Bulletin, Arnco's Jason Arnoldy called John Postle and asked if he was aware of the Bulletin.  **Exhibit 2**, at ¶15. Mr. Postle admitted that he knew about the Bulletin and stated that he would have to look into it.  **Exhibit 2**, at ¶15.

That afternoon, Mr. Postle sent a follow-up email admitting that the Bulletin should not have been sent and stating: "I had very little input into putting it together and quite frankly, had not considered our settlement agreement." **Exhibit 17** is a true and correct copy of Mr. Postle's May 22, 2018 email to Mr. Arnoldy. **Exhibit 2**, at ¶15.

42.     The Disparaging Communications and John Postle's email to Mr. Arnoldy show that Postle and John Postle did not take this Court's Permanent Injunction seriously.   They continued to disparage Arnco and its products, and they did nothing to stop Mr. Billesberger/WeldCor from doing the same.   Indeed, Postle may have encouraged Mr. Billesberger to share the information.

43.     Postle's, John Postle's, Mr. Billesberger's and WeldCor's actions have caused damages to Arnco in an amount that is not easily quantified nor fully known at this time. **Exhibit 1**, at ¶15.  Arnco has received feedback from its customer base that the assertions made in the 2014 Postle Article along with the LinkedIn discussion has created doubt in their minds as to the viability of the Arnco 350XT product specifically due to long term reapplication concerns. **Exhibit 1**, at ¶15.  This has contributed to a reduction in Arnco's Canadian sales on the order of 49% from 2014 to 2015, or $812,000 in lost sales.  **Exhibit 1**, at ¶15.

44.     After the 2018 Postle Bulletin surfaced, Arnco began dealing with customer concerns in the U.S. regarding the reapplication issue.   **Exhibit 1**, at ¶16.  To address these concerns, Arnco was required to re-direct resources from expanding its business to keeping its existing customers.   **Exhibit 1**, at ¶16.  Arnco has visited customer field sites, had numerous phone calls, and has been called directly into a customer's office to address these false claims. **Exhibit 1**, at ¶16.  These efforts have been, and continue to be, made by Arnco's President, Operations Manager, Technical Support, and Quality Control personnel.   **Exhibit 1**, at ¶16. These efforts have not only cost Arnco real money in travel and labor costs, but also valuable

time that should be used on the maintenance and growth of the business.  **Exhibit 1**, at ¶16.  Arnco does not yet know how many customers have stopped using its products in favor of Postle's products, how many potential clients it has lost, or how much revenue it has lost as a result of the Disparaging Communications.  **Exhibit 1**, at ¶16.

45.     For example, for the past two years, Arnco has been working to win the business of one independent oil and gas company (the "Customer").  **Exhibit 1**, at ¶17.  The Customer wanted to convert all of its joints of pipe to Arnco's 350XT.  **Exhibit 1**, at ¶17.  The applicator who works with that Customer recommended Arnco's 350XT product and applied it to approximately 600 pieces of the Customer's pipe.  **Exhibit 1**, at ¶17.  The Customer then decided to apply 350XT to all of its remaining pipe.  **Exhibit 1**, at ¶17.  Shortly thereafter, the Customer contacted Arnco and said that they had concerns about the product.  **Exhibit 1**, at ¶17.  The Customer said that the applicator has "done a 180 turn" and told the Customer not to use the product—that it could not be reapplied over itself more than two or three times and was not reliable.  **Exhibit 1**, at ¶17.  Confused by the applicator's change of heart, the Customer asked for a meeting with Arnco and the applicator.  **Exhibit 1**, at ¶17.

46.     Arnco's President and Operations Manager met with the Customer and the applicator to address the issue.  **Exhibit 1**, at ¶18.  When the Customer asked the applicator why he had "done a 180 turn," the applicator explained that he searched the internet for 350XT and found a discussion on LinkedIn stating that 350XT could not be reapplied over itself more than two or three times and was not reliable.  **Exhibit 1**, at ¶18.  The applicator believed those statements were true and advised the Customer to stop using the product.  **Exhibit 1**, at ¶18.

47.     Arnco explained its product to the Customer and that the LinkedIn statements are false.  **Exhibit 1**, at ¶19.  After considerable effort, Arnco ultimately was able to salvage the

Customer's work.  **Exhibit 1**, at ¶19.  However, had the Customer not contacted Arnco, it would have lost this contract, which is worth $297,000 per year in revenue.  **Exhibit 1**, at ¶19.

48.     Arnco's President and sales representatives have spoken with several other customers and potential customers to address the Disparaging Communications.  **Exhibit 1**, at ¶20.   However, Arnco has not determined the full extent of the damage caused by the Disparaging Communications.  **Exhibit 1**, at ¶20.

49.     Arnco's customers include the top three to four wire buyers in their respective markets, each of which purchases approximately $20,000/month of Arnco's products.  **Exhibit 1**, at ¶21.  Losing any of these customers would cause serious and ongoing damage to Arnco's business.  **Exhibit 1**, at ¶21.

50.     In addition to speaking with customers and potential customers to combat the misinformation spread in the Disparaging Communications, Arnco is spending more than $29,000 on testing to prove that its 350XT product works as advertised and can be reapplied over itself so that Arnco can share the test results with existing and potential customers.  **Exhibit 1**, at ¶22.

51.     Arnco also is spending more than $29,000 on testing to prove that its competitor's product can be applied over Arnco's 350XT product in order to show a major Customer that the claims Postle makes about Duraband not being able to be applied over 350XT consistently are false.  **Exhibit 1**, at ¶23.

52.     Arnco estimates it has spent more than $30,000 in labor addressing the false claims made by Postle, John Postle, Mr. Billesberger and WeldCor.  **Exhibit 1**, at ¶24.

53.     Although the full extent of Arnco's damages are not yet known, one thing is certain.  Postle, John Postle, Mr. Billesberger and WeldCor clearly believe that they will damage

Arnco's business, increase Postle's market share, and benefit financially from their disparaging statements, and that those benefits outweigh the risk of violating this Court's Order.

**C.**     **Postle Cannot Hide Behind Reincorporation to Evade the Injunction**

54.     As explained above, Postle claims the Permanent Injunction no longer applies to it because its new entity, Postle Delaware, "purchased the assets of Postle Ohio," but not "the liabilities or obligations." **Exhibit 14**.   However, "[a]n injunction would be of little value if its proscriptions could be evaded by the expedient of forming another entity to carry on the enjoined activity." *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1354 (Fed. Cir. 1998).   "For that reason, courts have consistently held that 'successors' are within the scope of an injunction entered against a corporation and may be held in contempt for its violation." *Id.* (citing *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 179 (1973) and other sources).

55.     "In a series of cases, the Supreme Court described successorship liability as turning on whether there is a 'substantial continuity of identity' between the two organizations." *Id.* (citing multiple sources).   "Although the original formulation of the test arose in the labor relations context, the 'substantial continuity of identity' test has been adopted as a general expression of the degree of closeness that Rule 65(d) requires for a non-party successor to be subject to the injunction." *Id.*   "[T]he general rule of corporate liability is that, when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where . . . the purchaser is merely a continuation of the selling corporation; or [] the transaction is entered into to escape liability." *Golden State Bottling Co., Inc. v. N.L.R.B.*, 414 U.S. 168, 182 n. 5 (1973).

56.     In *Additive Controls* (an appeal from the Southern District of Texas), the federal appellate court affirmed the district court's finding that a corporation formed after the district

court's injunction was a successor to the enjoined corporation, and thus the new corporation was bound by the injunction. 154 F.3d at 1354.  The court found there was a substantial continuity of identity between two corporations where the same person was incorporator, president, and majority shareholder of both corporations, and where both corporations shared an address and phone line. *Id.*

57.     This case is very similar to *Additive Controls*.  John Postle was President of Postle Ohio and remains President of Postle Delaware. *Compare* **Exhibit 6** (listing John Postle as President of Postle Ohio) *with* **Exhibit 18**, a true and correct copy of Postle Delaware's Foreign License on file with the Ohio Secretary of State (listing John Postle as President of Postle Delaware).  **Exhibit 20**, at ¶8.  Additionally, Postle Delaware operates from the same address previously used by Postle Ohio—5500 W 164th Street, Cleveland, Ohio 44142. *Compare* **Exhibit 19**, a true and correct copy of Postle's Statement of Information on file with the California Secretary of State (listing Postle Ohio's address), *with* **Exhibit 14** (listing Postle Delaware's address, which is the same as Postle Ohio's address).).  **Exhibit 20**, at ¶¶6, 9.  Postle Delaware also lists the same phone number as that previously used by Postle Ohio. *Compare* **Exhibit 4** (listing Postle Ohio's phone number) *with* **Exhibit 14** (listing Postle Delaware's phone number, which is the same as Postle Ohio's phone number).

58.     Furthermore, Postle Delaware maintains its online presence at the same domain previously used by Postle Ohio—www.postle.com. *Compare* **Exhibit 4** (listing Postle Ohio's web address) *with* **Exhibit 14** (listing Postle Delaware's web address, which is the same as Postle Ohio's web address). Postle Delaware also retained Postle Ohio's legal name: Postle Industries, Inc. *Compare* **Exhibit 19** (listing Postle Ohio's legal name) *with* **Exhibit 18** (listing Postle Delaware's legal name, which is the same as Postle Ohio's legal name).

59.     In addition, to anyone in the industry, Postle Delaware is indistinguishable from Postle Ohio.  Postle Delaware is operating the same business, selling the same products to the same clients in the same industry, and using the same distributors as Postle Ohio.  **Exhibit 1**, at ¶26.

60.     In sum, Postle Delaware appears to be the same entity as Postle Ohio, only reincorporated in a different state.  Interestingly, the 2014 Postle Article was published shortly after Delaware Postle was formed.  *See* **Exhibits 12 and 18**.  Thus, Postle Delaware is either "merely a continuation" of Postle Ohio or it was formed specifically to circumvent the Permanent Injunction.  Either way, Postle remains subject to the Permanent Injunction regardless of whether it chooses to call itself "Postle Delaware" or "Postle Ohio."

## IV.     **RELIEF REQUESTED**

61.     This Court should find Postle, John Postle, Mr. Billesberger and WeldCor in civil contempt of court.

62.     This Court also should Order Postle and John Postle, collectively, to:

(a)     pay a fine of $200,000.00 to Arnco ($100,000.00 for each of the above violations);

(b)     pay a fine of $100,000.00 to Arnco as compensation for costs incurred to remediate the effects of the Disparaging Communications;

(c)     pay Arnco's costs and attorney's fees associated with this enforcement action;

(d)     provide Arnco and the Court with sworn statements from each person who sent or received any of the Disparaging Communications, identifying the following:

(1)     the Disparaging Communication that was sent or received;

(2)     the person(s) who sent or received the Disparaging Communication; and

(3)     each person or entity to whom he/she sent the Disparaging Communication or website to which it was posted.

(e)      sign and send to all recipients of any Disparaging Communication a Retraction Letter drafted by Arnco;

(f)      prominently post the Retraction Letter on the Home Page of the following websites:

      (1)     www.postle.com

      (2)     http://hardbandingsolutions.com/postle/index_pi.php;

(g)      provide sworn statements to Arnco on January 15 and July 15 of every year affirming that Postle has complied with the Permanent Injunction and not published or disseminated any communication mentioning Arnco or its products;

(h)      immediately forward to Arnco any communication that violates the Permanent Injunction; and

(i)      pay a fine to Arnco of $100,000.00 for each future violation of the Permanent Injunction.

(j)      Further, if the Court finds that Leroy Billesberger and WeldCor are not bound by the Permanent Injunction, then Arnco requests that the Court Order Postle to pay an additional fine of $300,000.00 to Arnco ($100,000.00 for each LinkedIn post authored by Leroy Billesberger) plus an additional fine of $100,000.00 for each statement about Arnco or its products that Billesberger or WeldCor publishes or disseminates in the future.

63.    This Court also should Order Leroy Billesberger and WeldCor, collectively, to:

(a)      pay a fine of $300,000.00 to Arnco ($100,000.00 for each LinkedIn post authored by Leroy Billesberger);

(b)      pay a fine of $100,000.00 to Arnco as compensation for costs incurred to remediate the effects of Leroy Billesberger's posts;

(c)      pay Arnco's costs and attorney's fees associated with this enforcement action;

(d)      immediately provide Arnco and the Court with any statements disseminated by Leroy Billesberger and/or WeldCor between 2010 and the present that mention Arnco or its products, and for each such statement, identify each person or entity to whom he/she sent the statement or website to which it was posted;

(e)      sign and send to all recipients of any such statement the Retraction Letter, with a copy to Arnco;

(f)    prominently post the Retraction Letter on the Home Page of the following websites:

    (1)    http://www.weldcor.ca/

    (2)    https://www.linkedin.com/in/leroy-billesberger-46989373/

    (3)    any other website on which Billesberger posted any of the statement about Arnco or its products;

(g)    provide sworn statements to Arnco on January 15 and July 15 of every year affirming that Billesberger and WeldCor have complied with the Permanent Injunction and not published or disseminated any communication mentioning Arnco or its products;

(h)    immediately forward to Arnco any communication that violates the Permanent Injunction; and

(i)    pay a fine to Arnco of $100,000.00 for each future violation of the Permanent Injunction.

## V.    ALTERNATIVE REQUEST FOR ADDITIONAL DISCOVERY

64.    In the alternative, the Court should allow additional discovery into Arnco's allegations of contempt. "It is clear that a district court has the power to allow discovery into allegations of contempt." *Positive Software Sols., Inc. v. New Century Mortgage Corp.*, 3:03-CV-0257-N, 2004 WL 7329341, at *3 (N.D. Tex. Mar. 3, 2004); *see also Hilao v. Estate of Marcos*, 103 F.3d 762, 764 (9th Cir. 1996) (noting that the district court allowed discovery for allegations in plaintiff's contempt motion). Courts allow discovery into allegations of contempt when "there is prima facie evidence that [the enjoined party] disobeyed a court order." *Id.*

65.    Here, Arnco presents considerable prima facie evidence to demonstrate that Postle, John Postle, Mr. Billesberger and WeldCor disobeyed the Permanent Injunction. Accordingly, even if the Court does not believe, in its discretion, that the violations outlined in the Motion rise to the level of civil contempt, it should grant Arnco the opportunity to conduct additional discovery in order to further uncover the extent of the violations.

## VI.   CONCLUSION

66.     As shown above, Postle, John Postle, Leroy Billesberger and WeldCor violated this Court's Agreed Judgment and Permanent Injunction.   Accordingly, Plaintiff Arnco Technology Trust Ltd. requests that the Court set this matter for hearing and, after taking evidence, hold Postle, John Postle, Leroy Billesberger and WeldCor in contempt and impose the sanctions listed above.   Arnco further requests the Court grant it any other relief, legal or equitable, to which it is entitled.

SIGNED and DATED this, the 29th day of June, 2018.

Respectfully submitted,

JACKSON WALKER L.L.P.

/s/ Kathrine M. Silver
Kathrine M. Silver
State Bar No. 24013510
Fed. I.D. No. 25397
1401 McKinney, Suite 1900
Houston TX 77010
Telephone: (713) 752-4340
Facsimile: (713) 308-4141
Email: ksilver@jw.com

ATTORNEY-IN-CHARGE FOR PLAINTIFF
ARNCO TECHNOLOGY TRUST LTD.

**Of Counsel for Arnco:**
George A. Hayek
Fed. ID: 3149253
State Bar No. 24106066
JACKSON WALKER L.L.P.
1401 McKinney, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4224
Facsimile: (713) 752-4221
Email: ghayek@jw.com

## CERTIFICATE OF CONFERENCE

I certify that I have conferred with Brendan Conway, who is the Associate General Counsel for Postle Industries, Inc., and with Leroy Billesberger, who is the President of WeldCor Supplies, Inc., and we could not agree about the disposition of the motion.

/s/ Kathrine M. Silver
Kathrine M. Silver

## CERTIFICATE OF SERVICE

This is to certify that on the 29th of June, 2018, a true and correct copy of the foregoing was served via electronic mail **and certified mail, return receipt requested or Federal Express,** upon:

Brendan Conway
Associate General Counsel
Postle Industries, Inc.
5500 West 164th Street
Cleveland, Ohio 44142
Email: sparky@postle.com

Leroy Billesberger
President
WeldCor Supplies, Inc.
8-401 Pakwa Place
Saskatoon, Saskatchewan,
Canada - S7L 6A3
Email: leroy@weldcor.ca

/s/ Kathrine M. Silver
Kathrine M. Silver